IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

**FILED**
January 07, 2022
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____Belinda Gamez_____
DEPUTY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | . | Case No. 3:21-CR-00053-DB-1 |
| | . | |
| Plaintiff, | . | ** **VIA ZOOM TELECONFERENCE** ** |
| | . | |
| v. | . | |
| | . | |
| MICHAEL REYES, | . | |
| | . | |
| Defendant. | . | Wednesday, December 23, 2020 |
| . . . . . . . . . . . . . | . | 10:58 a.m. |

TRANSCRIPT OF PRELIMINARY/DETENTION HEARING
BEFORE THE HONORABLE MIGUEL A. TORRES
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:        United States Attorney's Office
                          By:  MALLORY JOSEPHINE RASMUSSEN, ESQ.
                          700 East San Antonio Avenue, Suite 200
                          El Paso, Texas 79901

For the Defendant:        Robert J. Perez, Attorney At Law
                          By:  ROBERT J. PEREZ, ESQ.
                          221 North Kansas, Suite 1103
                          El Paso, Texas 79901

Deputy Clerk:             Rita R. Velez
                          U.S. District Court
                          525 Magoffin Avenue, Suite 105
                          El Paso, Texas 79901

Transcription Company:    Liberty Transcripts
                          7306 Danwood Drive
                          Austin, Texas 78759
                          (847) 848-4907

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

2

INDEX

|                                                      | PAGE |
|------------------------------------------------------|------|
| Case called                                          | 4    |
| Court grants continuation as to Motion To Detain     | 4    |
| Government begins case in chief on Probable Cause    | 6    |
| Argument on Probable Cause                           |      |
| By:  Ms. Rasmussen                                   | 33   |
| By:  Mr. Perez                                       | 34   |
| Court's Ruling on Probable Cause - Granted           | 34   |
| End of Proceedings                                   | 35   |
| Certificate of Transcriber                           | 36   |

3

<span style="text-align:center; display:block">INDEX</span>

WITNESSES

PAGE

FOR THE GOVERNMENT:

Isaac Frost
  Direct Examination by Ms. Rasmussen      6
  Cross-Examination by Mr. Perez      16


FOR THE DEFENDANT:


(None)



EXHIBITS:        ID     EVD

FOR THE GOVERNMENT:

(None)


FOR THE DEFENDANT:

(None)

4

1    EL PASO, TEXAS, WEDNESDAY, DECEMBER 23, 2020, 10:58 A.M.

2          THE COURT:  All right.  The Court calls EP:20-M-3914,

3    United States of America v. Michael Reyes.  And we are here for

4    a preliminary and detention hearing.

5          Let me have the announcements of counsel, please.

6          MS. RASMUSSEN:  Good morning, Your Honor.  Mallory

7    Rasmussen for the United States.

8          THE COURT:  Good morning.

9          MR. PEREZ:  Good morning, Your Honor.  Robert Perez

10   for Michael Reyes.  We are ready to proceed on the preliminary

11   hearing, and I am asking for additional time on the detention

12   hearing.

13         THE COURT:  Okay.  And what is your reason for asking

14   for additional time on the detention hearing?

15         MR. PEREZ:  I need to verify information, Your Honor.

16   I visited with my client yesterday, and I was able to just

17   barely make contact with the family.  And there's things that I

18   need to gather and just not enough time to be able to do it in

19   this short time span.

20         THE COURT:  Okay.  Is there any objection from the

21   Government to continuing the detention portion of the hearing?

22         MS. RASMUSSEN:  No, Your Honor.

23         THE COURT:  Okay.  Very well.

24         So I will grant your request, Mr. Perez, for a

25   continuance of the detention matter only, and we will get you a

1  reset on that.  You know, of course, unfortunately, because of

2  the holidays we do have a shortened week next week, as well.

3  And so just bear with us.  We'll do our best to -- there you

4  are, we'll do our best to get this set soon.  All right?

5          Very well.  So then if we're ready to proceed on the

6  preliminary, Ms. Rasmussen -- well, let me do this.  Before we

7  get started, a couple of housekeeping matters.

8          Mr. Reyes, good morning.  Ordinarily, everybody that

9  you see on the screen right here would be present in my --

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  --  would be present in my courtroom.

12  We've been doing this -- we would be doing this face-to-face

13  all of us in person.  Because of the pandemic, we're unable to

14  do that.  Do I have your permission and your consent, sir, to

15  proceed with this portion?

16          MR. PEREZ:  Mr. Perez?  Yes, sir?

17          Yes, sir.

18          THE DEFENDANT:  Yes, Your Honor.

19          THE COURT:  Okay.  Very well.

20          Then, Ms. Rasmussen, -- thank you.  Then go ahead and

21  call your first witness, Ms. Rasmussen, please.

22          MS. RASMUSSEN:  The United States calls Isaac Frost.

23          THE COURT:  All right.  And, Agent Frost, if you

24  would please raise your right hand, sir.

25              ISAAC FROST, GOVERNMENT'S WITNESS, SWORN

Frost - Direct                                     6

 1          THE COURT:  Okay.  You can lower your hand.  You're

 2  now under oath.

 3          Ms. Rasmussen, you may proceed with your questions.

 4          MS. RASMUSSEN:  Thank you.

 5              DIRECT EXAMINATION OF ISAAC FROST

 6  BY MS. RASMUSSEN:

 7  Q    Agent Frost, can you state your full name for the record,

 8  please?

 9  A    Yes, ma'am.  It's Isaac Frost.

10  Q    And how are you currently employed?

11  A    I'm a special agent with the El Paso FBI.

12  Q    Are you familiar with the investigation into Mr. Michael

13  Reyes?

14  A    I am.

15  Q    Do you see him participating in this Zoom call this

16  morning?

17  A    Yes, ma'am.  I do.

18  Q    Could you identify him by stating the caption that's on

19  his video screen?

20  A    Yes, ma'am.  It's DDF.

21          MS. RASMUSSEN:  Your Honor, we'd ask that the record

22  reflect that Agent Frost has identified the Defendant.

23          THE COURT:  That's fine.  And if it's helpful to you,

24  we can have the Defendant very briefly, just very briefly,

25  lower his mask if we can do that.

Frost - Direct                                    7

1              THE DEFENDANT:  Yes, sir.

2              THE COURT:  All right.

3              THE WITNESS:  Yes, sir.  That's the Defendant,

4   Mr. Michael Reyes.

5              THE COURT:  Okay.  Then the record will reflect that

6   the Defendant has been identified as Michael Reyes.

7              All right.  Go ahead and proceed.

8   BY MS. RASMUSSEN:

9   Q    Agent Frost, can you tell us how Mr. Reyes came to the

10  attention of the FBI?

11  A    Yes, ma'am.

12        So the FBI has what's called NTOC.  It's our National

13  Threat Operations Center.  And essentially, they monitor

14  internet-based complaints regarding threats that are made

15  online.  And on December 14, they complainant contacted the

16  National Threat Operations Center of the FBI to report a Parler

17  user Razer99 for (indiscernible) that they referenced as

18  advocating murder and terrorism.

19  Q    And can you tell us what Parler is?

20  A    Yes, ma'am.

21        So my understanding of Parler is that it's a fairly new

22  social media platform, and it was created because people felt

23  like they were being censored on more traditional social media

24  platforms such as Facebook and Instagram, and Twitter.  And so

25  it's supposed to be a platform where people will not be

Frost - Direct                                    8

1  censored for posting their beliefs.

2  Q    And does a post on Parler or is a post on Parler viewable

3  by other individuals?

4  A    Yes, it is.

5  Q    Okay.  And can we talk about the particular posts made by

6  Razer99 now?  On what dates did those posts occur?

7  A    So our best recollection or our best understanding of it

8  because when someone posts on Parler, it will show how long ago

9  the post was made.  So it came to the attention of the FBI on

10 December 14.  And so when we were viewing the post, it will

11 say, for example, nine hours ago one day ago.  So our best

12 understanding is that the posts were made from approximately

13 December 12 of 2020 to approximately December 14 of 2020.

14 Q    Okay.  And what was the substance of those posts?

15       MS. RASMUSSEN:  And, Your Honor, before Agent Frosts

16 answers -- I'm sorry, I would ask that he have the ability to

17 read a couple of these posts verbatim because I think the

18 specific language used is important.

19       THE COURT:  Is there any objection to that, Mr.

20 Perez?

21       MR. PEREZ:  No, Your Honor.

22       THE COURT:  Okay.  That's fine.

23 BY MS. RASMUSSEN:

24 Q    Okay.  Agent Frost, can you talk to us about the substance

25 of the first post?

1  A    Yes, ma'am.

2       So the first post that we were made aware of stated the

3  following.  It was made by user Razer99.  The post was made as

4  a response to a United States Supreme Court -- an article about

5  the United States Supreme Court ruling about the Texas lawsuit

6  regarding the presidential elections of 2020.

7       And the post stated:

8            "Fuck all these traitors.  Since we have no support

9            from any level of the government, then we must start

10           killing these traitors in the streets.  This is the

11           last resort, people.  And if you and" -- then it tags

12           "@theproudboys" -- are true Americans, then you will

13           march on Washington D.C., SCOTUS' homes, and execute

14           those fucking traitors in their own yards, then wipe

15           out all of Congress and take the White House.

16           "If you are for the people, then you know this is the

17           only course of action we have left.  Fuck Congress.

18           Fuck dead America full of traitors.  Fuck SCOTUS.

19           Fucking kill that cunt, Amy Coney Barrett, first.

20           That cunt needs to see all her 38 children die in

21           front of her treasonist eyes.  Fucking whore."

22  Q    Agent Frost, were there additional posts by Razor99?

23  A    Yes, ma'am.

24  Q    Can you tell us about the second post?

25  A    Yes, ma'am.

1    The second post was referencing a news article regarding
2  potential election fraud in Michigan.  And it stated:
3            "Since the courts, our government, and Congress are
4            all against us and are betraying our country by
5            choosing sides with" -- I believe it was a
6            misspelling of Satan -- "then, we the people, have
7            the duty to execute these traitors in their homes,
8            streets, whoever they happen to be.
9            "It is officially open season on all Democrats,
10           Republicans, SCOTUS, White House traitors.  It's time
11           to send a clear message that traitors will die and so
12           will their children and families.  No more talk
13           because everyone in our government has betrayed us.
14           Kill them all and God will sort them out proper."
15 Q    Did any of Razor99's posts talk about any action that he
16 or she might take?
17 A    Yes.
18 Q    And what was the substance of that post?
19 A    So that post in entirety stated:
20           "Welcome to the dead states of Satanica.  Death and
21           suffering is all you will find in these dead lands.
22           Trump lied about having evidence.  He lied he was for
23           the people.  The fucking whore "@sidneypowell" also
24           lied, as well as "@lynnwood" and Guiliani and the
25           cure (phonetic) chubby blonde.  Sucks she too is a

1          traitor.  I liked her.

2              "Satan rules our entire continent.  All we do now is

3              wait until he comes to take us to prison camps --

4              until they come to take us to prison camps because

5              that's where we are going or doing in the next few

6              days to weeks.

7              "You stupid fucking cowards rolled over for these

8              Satanic filth, so don't expect any of us to help you

9              pussies.  I know I'm dying on my terms and will kill

10             as many of our enemies here in our country that I can

11             possibly kill, a life amount by the hundreds to

12             thousands if my setup is right, which I feel is

13             almost 100 percent.

14             "Just a couple of more tweets and then it's time to

15             feed so much traitor blood to this dead country.

16             Good luck fellow patriots.  I hope we survive long

17             enough to fight alongside each other."

18 Q    And through your investigation, were you able to identify

19 Razor99?

20 A    Yes, ma'am.  We were.

21 Q    How did that happen?

22 A    So, initially, the National Threat Operation Center

23 submitted some exigent requests to Parler regarding user

24 account Razor 99, and Parler provided the email address

25 Razor99@gmail.com and then a telephone number and an IP

Frost - Direct                                                    12

1  address.

2      The El Paso FBI actually submitted an exigent request to

3  AT&T for that phone number, and it came back with the user of

4  -- the subscriber of Michael Reyes and the Mr. Reyes' home

5  address.

6      We also submitted an exigent request to Charter

7  Communications regarding that IP address, and it came back to

8  Michael Reyes, as well, with his home address listed.

9  Q    And is Mr. Reyes' home address located within the Western

10 District of Texas?

11 A    Yes, ma'am.  It is.

12 Q    Once you identified him, did you obtain a search warrant

13 for his residence?

14 A    Yes, ma'am.  We did.

15 Q    And what happened when you -- what did you find, excuse

16 me, when you executed the search warrant?

17 A    We found approximately two iPhones that we -- we seized

18 that Mr. Reyes identified as belonging to him.  Additionally,

19 in the house we located a black duffel bag with an assault

20 rifle-style rifle and four fully-loaded magazines and then a

21 pistol, as well.

22 Q    At the time of the search warrant, did you speak to Mr.

23 Reyes?

24 A    Yes, ma'am.  We did.

25 Q    And what did he tell you?

A     So Mr. Reyes volunteered for an interview, and he made
statements regarding the posts including the fact that he is
the user Razor99 and that he did make the posts.  He stated
that he understands why they would be -- why people would view
them as threatening, however, he did state that he did not have
the intentions of carrying out the posts that he made.

Q     And did he say why he posted these things?

A     Yes, ma'am.  He gave a number of reasons on the initial
night that we interviewed him.  Mr. Reyes had a number of
personal stressors in his life recently, some family loss and
then some job-related stressors relating to the pandemic.  He
said he specifically felt betrayed by the Conservative Party,
that he felt that the most recent election was a betrayal.

      And, amongst other things, one of his biggest concerns was
that the Democrats in power would round up registered
Republicans and put them in what he called concentration camps.

Q     And what did he hope would happen or be the reaction of
his posts online?

A     So Mr. Reyes stated that he was hoping to get a reaction
by making the posts.  He was looking for other like-minded
individuals when he made the posts because he was looking for
kind of support in what he was -- was stating.  However, he did
state that he was not looking to create groups or to actually
carry out the things that he was -- was saying in his messages.

Q     Agent Frost, have you had an opportunity to review the two

                           Frost - Direct                    14

1  iPhones that you seized during the search warrant?

2  A    Yes, ma'am.  I've done initial reviews of both iPhones.

3  Q    And was anything relevant to the investigation found?

4  A    Yes, ma'am.  There was.

5  Q    What would that be?

6           THE COURT:  Can we hold on?  Hold it.  Hold it, hold

7  it.

8           You all froze for about ten seconds.  So the last

9  thing that I heard, if you would please do this, was the

10 question that have you searched the two iPhones, I think, or

11 the two telephones is what I heard.

12          Okay.  So let's just take it from there.  Apologies

13 for that.  I think the problem was on my end here.

14 BY MS. RASMUSSEN:

15 Q    And so, Agent Frost, have you had the opportunity to

16 review the phones you seized?

17 A    Yes, ma'am.  I have.

18 Q    Okay.  And was there anything relevant to this

19 investigation found?

20 A    Yes, ma'am.  There was.

21 Q    What was that?

22 A    So on the cell phone that Mr. Reyes identified as his cell

23 phone, there was a WhatsApp conversation between an

24 acquaintance of Mr. Reyes and Mr. Reyes.

25 Q    And what was the substance of that conversation?

                              Frost - Cross                    15

1    A    So I have the -- one of the messages in front of me, and

2    is it okay if I read directly from that message?

3              THE COURT:  That's fine.

4              THE WITNESS:  Okay.  So Mr. Reyes stated, and I

5    believe it was on December 15:

6              "I'm not depressed or sad, just to let you know.  My

7              anger toward what's happening in our country is

8              what's making me step away, not because I don't love

9              or believe in God but because of all the sacrifices

10             made.

11             "I want to go fight for my country, for my God, my

12             country, and loved ones, because it is pure agony at

13             the thought that these monsters could possibly hurt

14             someone I care about and that makes me so angry, Mr.

15             Ramirez.

16             "And I know it's in God's hands all of our futures,

17             and I accept that 100 percent.  But the human in me

18             wants to destroy our enemies that are murdering so

19             many innocent children and elderly.  I know God will

20             make everything right when the time is right.

21             "So with that being said, I will most likely be at

22             group this week.  I had packed all my gear and was

23             going to set up with a team, my buddies, but God is

24             telling us to wait.  God calmed me down so much today

25             and is helping me see a little more clearly and past

Frost - Cross                                    16

1           my anger."

2   BY MS. RASMUSSEN:

3   Q     And, Agent Frost, have you been able to determine where

4   Parler's servers are located?

5   A     Through open-source research, yes.

6   Q     And are they located within Texas?

7   A     No, ma'am.  They are not.

8           MS. RASMUSSEN:  I'll pass the witness.

9           THE COURT:  Mr. Perez?

10          MR. PEREZ:  Thank you, Your Honor.

11                CROSS-EXAMINATION OF ISAAC FROST

12  BY MR. PEREZ:

13  Q     Agent Frost, I have some questions concerning when this

14  investigation started.  Was it --

15  A     Yes, sir.

16  Q     -- December 14?

17  A     So the FBI was notified of the post, I believe, at around

18  11 p.m. on the 14th.  So it would be late night on the 14th

19  into the morning of the 15th, sir.

20  Q     Okay.  And if I understand your complaint in Paragraph 3,

21  you indicated that the FBI conducted a review of the account,

22  the Razor account.  Is that correct?

23  A     Yes, sir.  That is correct.

24  Q     Okay.  So how extensive a review of this account did you

25  do?

1 A    So me personally, I have not been able to review the

2 account because by the time that our office was notified of the

3 posts, the posts had been taken down and the account had been

4 made private.

5      However, our -- National NTOC, our National Threat

6 Operation Center that I referenced earlier, was able to take

7 screenshots of the mentioned posts.

8 Q    Okay.  So were you looking at just two days or were you

9 looking at the entire account of -- or history of the account?

10 A    Just the two days referenced in -- that I referenced today

11 is what I'm aware of.

12 Q    So was somebody else reviewing the entire account?

13 A    I'm unsure of that.

14 Q    Okay.  Well, if you say that what you did was limited to

15 two days and you weren't -- you're unsure if anybody else

16 looked at things.  Was there other people looking at the

17 account?

18 A    I'm sorry, sir.  What was the end of your question?

19 Q    Was there other agents looking at the entire account?

20 A    I'm unsure of that.

21 Q    Okay.  So can you say that this account that belongs to

22 Razor previous to December 12 through the 14, if there had been

23 any kinds of text messages that looked anything like the ones

24 that you described right now?

25 A    I'm not aware of any messages prior to December 12.

Frost - Cross                              18

1  Q    Okay.  So prior to December 12, we have no indications of
2  any rants.  Isn't that correct?
3  A    I'm unsure of that, sir.
4  Q    You're not aware of any, are you?
5  A    No, sir.  I'm not.
6  Q    Nobody has brought any of those to your attention, have
7  they?
8  A    No, sir.  They have not.
9  Q    There had been no suspicious activity prior to the dates
10 that you testified of December 12 through 14?
11 A    I can't speak to that, sir.  I'm not aware.
12 Q    Okay.  Now you're saying that you were -- the NTOC is
13 supposed to investigate threats.  How do you define a threat?
14 Is that -- what do you mean by that?
15 A    So they sort of operate as an intake center, essentially
16 allowing the public to report anything that they find to be
17 concerning online.  And then there are agents and then support
18 staff members that kind of review those things and then forward
19 the information to the applicable field office.
20 Q    Okay.  So was there a threat made to any individual
21 person?
22 A    Yes, sir.  There was.
23 Q    Well, he threw out a statement where he was ranting about
24 the evilness of the United States and different things,
25 correct?

Frost - Cross                                    19

1  A    Yes.

2  Q    He didn't send an actual email making a direct threat to

3  anybody, did he?

4  A    There was no email sent, no.

5  Q    So what he posted was just something where he was upset

6  about the election and different things that were in the news.

7  Isn't that correct?

8  A    I would disagree with that.

9  Q    Okay.  Would you describe what he was doing as a rant or

10 as a direct threat to a specific person?

11        MS. RASMUSSEN:  Your Honor, I'm going to object.  I

12 think the issue as to what is a threat is a legal question and

13 not one that the agent should be answering.

14        THE COURT:  I'm going to sustain the objection.  You

15 can rephrase that question, Mr. Perez.

16        MR. PEREZ:  Okay.  Well, I'll move on.

17 BY MR. PEREZ:

18 Q    So basically what he's posting is a displeasure over some

19 of the things that he's seeing in the news.  Isn't that

20 correct?

21 A    No, sir.  I would disagree with that.

22 Q    Okay.  He made -- you testified that he talked about the

23 Proud Boys.  Isn't that correct?

24 A    He did tag the Proud Boys in one of his posts.  Yes, sir.

25 Q    Okay.  And he wasn't threatening the Proud Boys.  Was he?

1  A    No, sir.  He was not threatening the Proud Boys as far as

2  I'm aware.

3  Q    In fact, he was calling them true Americans?

4  A    Yes, sir.

5  Q    And that he was waiting from the word from God to carry

6  out the will of God as far as what was going on in our country.

7  Isn't that correct?

8  A    You're -- you're mixing multiple messages here, so I would

9  disagree with that statement.

10 Q    Okay.  What did he say about the Proud Boy and waiting for

11 them to join with him to go and overtake the traitors?

12 A    I could re-read that message if you'd like me to.

13 Q    Sure.

14 A    Okay.  So he stated in that -- the message, I believe,

15 that you're referencing:

16            "Fuck all these traitors.  Since we have no support

17            from any level of the government, then we must start

18            killing these traitors in the streets.  This is the

19            last resort, people.  And if you and @theproudboys"

20            are true Americans, then you will march on D.C.

21            SCOTUS' homes and execute those fucking traitors in

22            their own yards, then wipe out all of Congress and

23            take the White House.

24            "If you are for the people, then you know this is the

25            only course of action we have left.  Fuck Congress.

Frost - Cross                                    21

1          Fuck dead America full of traitors.  Fuck SCOTUS.

2          Fucking kill that cunt, Amy Coney Barrett, first.

3          That cunt needs to see all her 38 children die in

4          front of her treasonist eyes.  Fucking whore."

5  Q    Okay.  And you also testified that on a phone -- in

6  Paragraph 9, you testified that Mr. Reyes sent a text message

7  saying that God is telling us to wait.  Isn't that correct?

8  A    Yes.  So in addition to saying that God is telling us to

9  wait, he also mentions that he feels a call to take action.

10 Q    Okay.  And you are aware that the President of the United

11 States asked the Proud Boys specifically to stand by?  Isn't

12 that correct?

13 A    I'm aware of the statement that you are speaking of.

14 Q    Okay.  And is that, in essence, telling people to hold on

15 and wait for further instructions?

16          MS. RASMUSSEN:  Your Honor, I'm going to object.  I

17 think that calls for the agent to opine on what the President

18 may have meant.

19          THE COURT:  Mr. Perez?

20          MR. PEREZ:  Your Honor, I'm just asking for if he's

21 aware of what the President said and told people to stand by

22 and if that's actually was made public and pretty much

23 everybody is aware of that.

24          THE COURT:  Well, I mean that's different from the

25 question that you were asking, which is what did the President

Frost - Cross                    22

1  mean by that, essentially getting into that.  But I mean to the

2  extent that you're asking whether he's aware of that statement

3  and --

4          MR. PEREZ:  I'm just going to (indiscernible) to the

5  statement, Your Honor, because obviously we don't know what the

6  President meant, but just the pure words of what the President

7  said.

8          THE COURT:  All right.  Look, I will -- I'm going to

9  sustain the objection.  If you want to rephrase it, I mean I'll

10 let you get into this briefly.

11         MR. PEREZ:  Okay.

12 BY MR. PEREZ:

13 Q    Agent, you did testify that you were aware that the

14 President told the Proud Boys to stand by and wait further

15 instructions?

16 A    I'm aware of that statement, yes.

17 Q    And you're aware that Mr. Reyes called the Proud Boys true

18 Americans.  Isn't that correct?

19 A    Yes, sir.  I'm aware of that.

20 Q    Okay.  And you are aware that the President has been

21 saying that our country is going to be taken over by

22 socialists?  Are you aware of that?

23 A    I'm not aware of that direct statement that the President

24 has made, no.

25 Q    Okay.  Are you aware of different groups that are

1  advocating civil war?

2         MS. RASMUSSEN:  Your Honor, I'm going to object.  I
3  don't see the relevance of these questions to the charges at
4  hand.

5         THE COURT:  What is the relevance of this line of
6  questioning, Mr. Perez?

7         MR. PEREZ:  Your Honor, the relevance goes to my
8  client's state of mind as to what he thinks is happening, as to
9  whether or not he is actually going to go and carry out threats
10  or if he's just waiting for further instructions.

11         THE COURT:  Ms. Rasmussen?

12         MS. RASMUSSEN:  Your Honor, I think that these
13  statements don't have any relevance to the charges.  Mr. Reyes'
14  state of mind as to what was happening in the political world
15  is not the focus of the charge.  The focus is the language he
16  used in these online posts and how he intended those posts to
17  be understood and received by the reader.

18         THE COURT:  You know, I'm going to sustain the
19  objection.  And, Mr. Perez, I guess what I would say with
20  regard to this, I mean I do see what you're driving at, but I
21  think if we could just zero in on the elements of the offense
22  and focus our questions on that.

23         MR. PEREZ:  Part of my questions also are going as to
24  whether or not detention is appropriate, Your Honor.  And I'll
25  focus more on that at this point.

Frost - Cross                         24

1           THE COURT:  But it's -- yeah, I'm still sustaining

2   the objection.  Go ahead.

3   BY MR. PEREZ:

4   Q    Agent Frost, you say that on the 15th of December FBI

5   agents went to the home of Mr. Reyes?

6   A    Yes, sir.  That's correct.

7   Q    Was he cooperative?

8   A    Yes, sir.  He was.

9   Q    Was he polite?

10  A    Yes, sir.  He was.

11  Q    In fact, he was pretty compliant with all of your

12  requests.  Isn't that correct?

13  A    Yes, sir.  He was.

14  Q    And the FBI did not arrest him on December 15, did you?

15  A    No, sir.  We did not.

16  Q    If he is such a danger to the community, why wasn't he

17  arrested on December 15?

18          MS. RASMUSSEN:  Your Honor, I'm going to object.  I

19  think the decision of whether to arrest an individual in this

20  circumstance was left to the U.S. Attorney's Office, not to the

21  FBI.

22          THE COURT:  I'm going to overrule the objection.  I

23  mean Mr. Frost can answer if he has direct knowledge of it.

24          THE WITNESS:  So, Mr. Perez, as you're kind of

25  driving at in this case, part of what our duty is is as the FBI

1  is to uphold the Constitution which includes freedom of speech.

2  And so we wanted to review all of the evidence as much as

3  possible in its entirety to ensure that what we are doing was

4  protecting the public and not violating someone's rights for

5  freedom of speech.

6        So part of that was to take those cell phones and do

7  a thorough as much as possible review of them in order to

8  determine if there was, I guess, further intent with these

9  threats and to determine the nature of the threats.

10  BY MR. PEREZ:

11  Q    Okay.  And did you have a therapist with you when you went

12  to question Mr. Reyes?

13  A    So, sir, we took the -- so it was the FBI and then also

14  the Crisis Intervention Team with the El Paso Police

15  Department, which is comprised of a police officer partnered

16  with a mental health expert.  I'm not sure of their exact

17  qualifications and what their exact title is.

18  Q    Okay.  So when you went to question Mr. Reyes, you

19  actually had mental health experts with you?

20  A    Yes, sir.  That's correct.

21  Q    And I guess a mental health expert can determine if an

22  intervention is necessary immediately.  Isn't that correct?

23  A    So their role, and this is just my general understanding

24  of it, is to determine if an individual is in what they call

25  crisis.  And by the state definition of what that is, that's

1 basically determining if they should be placed immediately into

2 a mental health facility against their own will.  And they are

3 the ones who would make that determination using their own set

4 of criteria.

5 Q    Okay.  And, obviously, they didn't make a determination

6 that he needed to be detained immediately.  Isn't that correct?

7 A    Yes, sir.  They referred him for psychiatric services, but

8 on the 15th, they did not detain him in the (indiscernible),

9 no.

10 Q    Okay.  And you say they referred him to psychiatric

11 services.  Did they recommend that he go to visit with

12 Emergence or with the psychiatrist?

13 A    It may be just my connection, sir, but I'm having a hard

14 time understanding you.  I'm sorry.  Could you repeat the

15 question?

16 Q    Did -- at that point, was he referred to Emergence Health

17 Network or to a psychiatrist?

18 A    I'm unsure of what referral was made.  I just know that

19 they made a psychiatric referral, and that's the extent of what

20 my knowledge is.

21 Q    Okay.  And didn't Mr. Reyes follow through with that

22 referral?

23 A    Mr. Reyes informed us in his post-arrest interview that he

24 did attend the psychiatric appointment.

25 Q    And did you verify that?

Frost - Cross                                    27

1  A    I have not verified that, no.

2  Q    Okay.  So when did that take place, on the 17th of

3  December?

4  A    I'm unsure of that.

5  Q    Okay.  So Mr. Reyes was at his home on the 16th, correct?

6  A    I am not sure where Mr. Reyes was on the 16th.

7  Q    You didn't keep him under surveillance?

8  A    No, sir.  We did not.

9  Q    If you thought that he was a danger to the community,

10 wouldn't you have kept him under surveillance?

11 A    It's not part of our protocol to surveil people for 24

12 hours a day, sir.

13 Q    Well, you said part of what you're doing was to verify if

14 there was a viable threat.  Isn't that correct?

15 A    Yes, sir.

16 Q    Okay.  So a decision was made that he didn't need to be

17 followed after you left him on December 15, correct?

18 A    Yes.  I guess that would be correct.

19 Q    And nobody was following him on December 16, correct?

20 A    Correct.

21 Q    Nobody was following him on December 17.  Isn't that

22 correct?

23 A    That's correct.

24 Q    And during that time period, any firearms that he had were

25 taken into your possession.  Isn't that correct?

Frost - Cross                                28

1  A    Yes, sir.  Any firearms that we were aware of.

2  Q    Would it be fair to say that you thought that any threat

3  that was there had been neutralized?

4  A    Like I said before, we were trying to gather all evidence

5  and determine what -- to determine if there was a threat there.

6  Q    Okay.  And when you looked at his phone, he said that God

7  had calmed him down.  Isn't that correct?

8  A    Yes.  I believe at the end he said "God calmed me down so

9  much today."

10 Q    And is helping him see clearly and that his anger had

11 passed.  Isn't that correct?

12 A    That is what he said at the end correct.

13 Q    Okay.  So a decision at some point was made to go to his

14 apartment again on December 18?

15 A    Yes.  We filed a complaint and obtained an arrest warrant

16 for Mr. Reyes on December 18.

17 Q    Where did you execute it?

18 A    I'm sorry.  What?

19 Q    Where did you execute that warrant?

20 A    We executed it on his residence.

21 Q    Okay.  And when you went to his residence on the 18th, was

22 he polite?

23 A    Yes, sir.  He was.

24 Q    Was he cooperative?

25 A    Yes, sir.  He was.

Frost - Cross                              29

1  Q    Was he in any way threatening to any of the agents?

2  A    No.  Not to any of the agents, sir.

3  Q    Didn't have any weapons that were there ready to be used,

4  did he?

5  A    I'm not sure about that.

6  Q    Okay.  So what do you think that he had that was ready to

7  be used?

8  A    So we did not search his house on the 18th, so I can't

9  really speculate to whether or not he had weapons ready to be

10  used.

11  Q    Okay.  You didn't see anything that was there that looked

12  threatening for him to use against any of the agents that came

13  to his home.  Isn't that correct?

14  A    Not in plain view when we arrested him.  No, sir.

15  Q    Okay.  And did you search his home after you took him into

16  custody?

17  A    No, sir.  We did not.

18  Q    Okay.  You didn't feel that there was a need to or you

19  would have.  Isn't that correct?

20  A    No.  Actually, we did not have a search warrant, so we

21  didn't have the legal authority to search his home at that

22  point.

23  Q    Well, you could have searched incident to arrest.  Isn't

24  that correct?

25  A    We could have searched windspan grasp area near him

Frost - Cross                                    30

1  lunging distance but, no, we cannot have searched his whole
2  home incident to arrest.  No, sir.
3  Q    Okay.  And you didn't see anything within his grasp or
4  lunging area that would have been a threat to the agents.
5  Isn't that correct?
6  A    Correct, sir.
7  Q    When you arrested him, did you take him into custody and
8  question him?
9  A    Yes, sir.  We did question him.
10 Q    Okay.  And was that questioning videotaped and audiotaped?
11 A    Yes, sir.  It was.
12 Q    Okay.  And did Mr. Reyes ask for help from the agents?
13 A    No, sir, he did not ask for help from the agents.
14 Q    He wasn't asking for a psychiatric or mental health help?
15 A    No, sir.  He did not.
16 Q    Okay.  Did he say that he wanted to go and carry out
17 threats against anybody?
18 A    No, sir.  He did not.
19 Q    What did he say about any -- did he remember making any
20 threats at that point?
21 A    Yes, he did remember making the posts that we discussed.
22 Q    Okay.  And did he say that he mean any harm?
23 A    He said that he did not mean to carry out any of the
24 things that he said in his threats.
25 Q    Okay.  And you did question him and I guess (audio drop)

Frost - Cross                                    31

1   he was under a lot of stress?

2          THE WITNESS:  Sir, I'm sorry.  It may just be my

3   headset.  Is anybody else having trouble understanding Mr.

4   Perez or is it just me?

5          THE COURT:  I'm having trouble.

6          Mr. Perez, can you repeat that question?  You broke

7   up -- you've been doing fine in terms of the audio, but you

8   broke up a little bit on that question.

9          MR. PEREZ:  Okay.  Let me see if I can rephrase that

10  because I don't actually remember what I was saying.

11  BY MR. PEREZ:

12  Q    When he was -- when you questions him, was that at FBI

13  Headquarters?

14  A    Yes, sir.  It was.

15  Q    Was he angry or expressing any anger towards the agents?

16  A    He did not express any anger towards the agents, no (audio

17  drop).

18         THE CLERK:  Okay.  I have audio breaking up with

19  Agent Frost.

20         THE WITNESS:  Okay.  I changed my headset out because

21  it was breaking up.  But can y'all hear me now or no?

22         THE COURT:  I can hear you fine.

23         THE CLERK:  Yes, it sounds fine now, Agent.

24         THE WITNESS:  Okay.  Sorry about that.

25         MR. PEREZ:  Okay.

1  BY MR. PEREZ:

2  Q    How long did you question him for at FBI Headquarters?

3  A    I believe the interview lasted approximately 50 minutes.

4  Q    Fifteen minutes or fifty?

5  A    5-0.  5-0.  Fifty minutes.

6  Q    Okay.  Thank you.

7       During that interview, did he tell you that he wanted to

8  go and hurt anybody?

9  A    No, sir.  He did not.

10 Q    In fact, it was quite the opposite, right?  He was very

11 apologetic for making any kinds of crazy statements?

12 A    He did apologize for the statements that he made, yes.

13         MR. PEREZ:  That's all the questions I have at this

14 time, Your Honor.

15         THE COURT:  All right.  And, Ms. Rasmussen, any

16 further questions?

17         MS. RASMUSSEN:  No, Your Honor.

18         THE COURT:  Okay.  And so -- and Agent Frost, if you

19 would -- I mean you can stay on, but if you'd mute yourself,

20 I'd appreciate it.

21         Any other witnesses or evidence, Ms. Rasmussen?

22         MS. RASMUSSEN:  No, Your Honor.

23         THE COURT:  Any witnesses or evidence, Mr. Perez?

24         MR. PEREZ:  No, Your Honor.  We would reserve the

25 right to present evidence at a detention hearing.

1          THE COURT:  Absolutely.  And let me go ahead and hear
2     your argument as to probable cause, Ms. Rasmussen.

3          MS. RASMUSSEN:  Yes, Your Honor.

4          The agent, Agent Frost's testimony shows that these
5     messages on Parler were made online, they were made in a format
6     that allowed others to view them.  And the specific words used
7     by Mr. Reyes in these messages are advocating for violence,
8     execution of our political leaders, members of the Supreme
9     Court.  He named specific members of the Supreme Court.  He
10    named various political parties.  He named the President in one
11    of his posts.

12         And there's also a post where he talked about the
13    actions that he planned to take, that he wanted to execute
14    hundreds to thousands of individuals, that he was essentially
15    working on his plan, his setup, and that that setup was almost
16    100 percent ready to go.

17         That message of his actions that he planned to take
18    and the preparations he made in conjunction with his statements
19    calling for the execution of certain individuals, together we
20    believe makes them a threatening communication.  They may not
21    have been made directly to the President or to Justice Barrett,
22    but they were made in a format that is public and, therefore,
23    available for others to see.

24         The serves for Parler are not located within Texas.
25    So the communications or the messages traveled in interstate

34

commerce.  Given all of that, we think we've established

probable cause for the threatening communication charge.

THE COURT:  All right.  Thank you very much.

Mr. Perez?

MR. PEREZ:  Your Honor, the statements that he made

were, as Ms. Rasmussen stated, were not made directly to any

person.  And as the FBI agent said, they were concerned about

people's First Amendment rights.  And I'd submit that that's

what he was doing is just First Amendment ranting and raving.

Even though it may be a little bit extreme, at what point is it

a crime.

And the statute, 875, is more in the terms of intent

to extort or actually threatening to injure a specific person

for a particular reason such as a threat to kidnap them or to

get something in exchange.

And I don't know if we have the necessary elements to

have probable cause under 18 U.S.C. 875.  And that's all I

would have, Your Honor.

THE COURT:  All right.  Thank you very much.

All right.  The Court would refer to probable cause

as to whether the Government has met its burden that those are

an offense of 18 U.S.C. 875(c), the transmitting of

communications in interstate commerce containing threats to

kidnap or injure a person.  I think the Government has met its

burden with regard -- under the standard setup for preliminary

35

1    hearing.

2           So I do find that there is probable cause in this

3    case.

4           And, Mr. Perez, with regard to detention, we will --

5    obviously, you requested some time.  We granted -- I granted a

6    continuance so that you could look into detention matters.  And

7    we will just get you a setting, okay.  Like I said, next week

8    is a very short week, and so -- but we will do our best to get

9    this reset soon.  All right?

10          Anything else --

11          MR. PEREZ:  I'll work with -- you're going to make

12   sure that we have a date that works for both of us because I

13   know that (indiscernible) fill up quickly.

14          THE COURT:  I understand.  But we -- you know, I have

15   an obligation to give the Defendant his detention hearing that

16   he's entitled to, so we'll work together on that to schedule

17   that.

18          Anything else, Ms. Rasmussen?

19          MS. RASMUSSEN:  No, Your Honor.  Thank you.

20          THE COURT:  Okay.  Very well.  Then we are in recess

21   on this case.

22       (Proceedings concluded at 11:40 a.m.)

23                         * * * * *

24

25

**C E R T I F I C A T I O N**

1

2          I, DIPTI PATEL, court approved transcriber, certify

3 that the foregoing is a correct transcript from the official

4 electronic sound recording of the proceedings in the above-

5 entitled matter, and to the best of my ability.

6

7 /s/ Dipti Patel

8 DIPTI PATEL, CET-997

9 LIBERTY TRANSCRIPTS            DATE: January 7, 2022

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25